**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHELLE BURGEE** | : | **CIVIL ACTION NUMBER:** |
| 6348 Ardleigh Street | : | |
| Philadelphia, PA 19138 | : | |
|     Plaintiff | : | |
| | : | |
|     V. | : | **JURY TRIAL DEMAND** |
| | : | |
| **HEALTH PARTNERS PLANS, INC.** | : | |
| 901 Market Street | : | |
| Philadelphia, PA 19107 | : | |
|     Defendant | : | |

## COMPLAINT

### I.   INTRODUCTION

1.     Plaintiff brings this action to remedy defendant's termination of her in retaliation for her good faith report of wrongdoing or waste to her employer in violation of the Pennsylvania Whistleblower Law, 43 Pa. C.S. § 1421, *et seq.* and further to remedy defendant's violation of her rights under the Family Medical Leave Act, ("FMLA") 29 U.S.C. § 2601, *et seq.*, and for failing to promote her based on her race in violation of 42 U.S.C. § 1981.

### II.   PARTIES, JURISDICTION, AND VENUE

2.     Plaintiff Michelle Burgee is an African-American adult female, who is a citizen of the United States and resides at the above-captioned address.

3.     Defendant Health Partners Plans, Inc. ("HPP") is a business entity with corporate headquarters located at the above-captioned address.

4.     According to its website, HPP is a managed care organization ("MCO") that contracts directly with the Commonwealth of Pennsylvania to disperse millions of dollars of public funds to offer Medicaid, Medicare, and Children's Health Insurance Program ("CHIP") plans to its more than 250,000 members in Philadelphia, Chester, Delaware, Bucks and Montgomery counties.

5.     These federal and state funds are dispersed to a "provider network" comprised of a number of hospitals and other medical vendors.

6.     A number of HPP's provider hospitals own HPP including, Temple University Hospital, Aria Health, Einstein Medical Center, Episcopal Hospital, Hahnemann University Hospital, St. Christopher Hospital for Children.

7.     According to its website, HPP's Health Partners Medicare program "is an HMO plan with Medicare and Pennsylvania State Medicaid program contacts."

8.     At all times material to this complaint, defendant received block funding based on a formula directly from the Commonwealth of Pennsylvania's Department of Health and Human Services through its "Health Partners Medicare" program for its Medicaid programs.

9.     HPP also receives block funding based on a formula directly from the federal government to provide medical services for eligible Medicare recipients.

10.     As a MCO that provides services to Medicaid and Medicare recipients, HPP is mandated to adhere to the Medicaid and Medicare regulations.

11.     As an MCO, HPP is subject to oversite by the Center for Medicare and Medicaid Services ("CMS").

12.     There is a financial incentive for MCOs such as HPP to be noncompliant with eligibility and appeal regulations so as to deny eligible recipients the medical services to which they are entitled because if an MCO does not spend the money allocated to it, it does not have to return the money.

13.     Plaintiff worked for HPP at their facility located at 901 Market Street Philadelphia, PA 19107.

14.     HPP is an "employer" within the meaning of Pennsylvania Whistleblower Law, 43 P.S. § 1422 and the FMLA.

15.     HPP is a "public body" within the meaning of Pennsylvania Whistleblower Law, 43 P.S. § 1422.

16.     This Court has original jurisdiction pursuant to 28 U.S.C. §1331.  This Court has supplemental jurisdiction of Plaintiff's claim under the Pennsylvania Whistleblower Law pursuant to 28 U.S.C. §1367.

17.     Venue is appropriate in this judicial district because at all times material to this action Plaintiff worked for HPP in this judicial district and the material acts and omissions giving rise to this action all occurred in this judicial district.

## III.   FACTUAL ALLEGATIONS

### A.  Plaintiff's Was an Excellent Performer at HPP

18.     Michelle Burgee is a forty-eight year-old African-American female who worked for HPP from 1998-2007 and then again from December 2011 through April 6, 2016, when she was terminated from her position of Manager of Ancillary Services.

3

19.     During the entirety of her more than thirteen years at HPP Plaintiff had an excellent record of performance.

20.     Plaintiff was never disciplined nor was she ever put on a performance improvement plan during the entirety of her employment at HPP.

21.     Plaintiff left HPP in 2007 for a better opportunity as a Director of Utilization Management at Bravo Health in Philadelphia.

22.     In 2011, Andrea D'Angelo, the Vice President of Utilization Management ("UM") at HPP, recruited Plaintiff to return to HPP with a substantial salary increase and a promotion from her prior position at HPP as Manager of Pre-certification and Appeals to Manager of Ancillary Services.

23.     As an additional incentive to return to HPP, Mrs. D'Angelo told Plaintiff that she was intended to create a Director of UM position and felt that Plaintiff would be a good fit for that position.

24.     Plaintiff decided to return to HPP largely based on the representation that she would be promoted to Director of UM, although no time frame was given for when that would occur.

25.     As Manager of Ancillary Services Plaintiff's job responsibilities included: Managing daily operations of the Ancillary Services Department to ensure proper utilization management of homecare, durable medical equipment, transportation and shift care services; ensuring the department was compliant with Medicare, Department of Health (DOH) regulatory requirements and The National Committee for Quality Assurance (NCQA) standards; updating policies and procedures and identifying areas of improvement; overseeing the Delegated Dental and Physical Therapy vendors; and handling personnel recruitment, development and retention.

26.     Plaintiff performed her job as Manager of Ancillary Services superbly until she was terminated as her performance reviews and merit increases reflect, the most recent of which was January 2016.

## B. **Plaintiff's February 2016 Reports of Waste or Wrongdoing to HPP**

27.     In February 2016, plaintiff discovered HPP was not in compliance with Medicare or Medicaid regulations and alerted multiple HPP Directors of the non-compliance issues.

28.     Plaintiff learned that the Utilization Management department headed by Paula Tomczuk, which handles services for Medicare and Medicaid members for in-patient, skilled facility, rehab facility, and elective procedures that may lead to in-patient, had many more out of compliance cases than Mrs. Tomczuk had reported.

29.     Mrs. Tomcuzk had stated in an email that her department had 160 cases that were out of compliance with the Medicare and Medicaid regulations.  Mrs. Tomczuk reported this in advance of HPP's end of year report.

30.     Plaintiff's compliance review found that there were 450 out of compliance cases in elective procedures. Elective procedures represents only one small branch of Mrs. Tomcuzk's department.  Plaintiff was easily able to retrieve these out of compliance cases by simply searching for "out of compliance cases."

31.     Plaintiff discovered that these cases were out of compliance because HPP was not making eligibility determinations for its customers within the timeframe dictated by Medicare and Medicaid regulations.

32.     When an enrollee in a Medicare Advantage ("MA") plan seeks to receive services and have them covered by Medicare, the enrollee, the enrollee's physician, or representative

makes a request for service to the plan (these are typically for outpatient and/or elective procedures). The MA plan must then make what is referred to in the regulations as an "organization determination," concerning the eligibility of the requested service.

33.     Similarly, when an enrollee covered by Medicaid seeks to receive services HPP is likewise required to make a clinical determination concerning the eligibility of the requested service.

34.     HPP is required to have in place a procedure for making timely organization determinations and clinical determinations under Medicare and Medicaid regulations, and an appeals process for enrollees. *See* 42 CFR § 422.562; 42 CFR § 422.566; 42 CFR§ 438.214; 42 CFR§438.400;   42 CFR§ 438.404.

35.     Pursuant to the Medicare and Medicaid regulations, HPP was required to meet the following timeframe:  When a party has made a request for a service, the MA organization must notify the enrollee of its determination as expeditiously as the enrollee's health condition requires, **but no later than 14 calendar days after the date the organization receives the request** for a standard organization determination.

36.     The MA organization may extend the timeframe for an additional 14 calendar days if the enrollee requests the extension or if the organization justifies a need for additional information and articulates why the delay is in the interest of the enrollee (for example, the receipt of additional medical evidence from noncontract providers may change an MA organization's decision to deny).

37.     **When the MA organization extends the timeframe, it must notify the enrollee in writing of the reasons for the delay, and inform the enrollee of the right to file an**

**expedited grievance if he or she disagrees with the MA organization's decision to extend.**
42 CFR § 422.568(b) 42 CFR§ 438.404.

38.     Further, the failure to provide timely notice of an organization determination itself
constitutes an adverse determination, and may be appealed. 42 CFR § 422.568(f).

39.     Centers for Medicare and Medicaid Services ("CMS") may terminate its contract
with an MA organization if the organization fails to comply with the requirements regarding
grievances and appeals, including those in section 422.568.  *See* 42 CFR § 422.510(a).

40.     Further, the MA organization's agreement to comply with the determination and
appeal requirements is a required part of every contract between such an organization and CMS,
and such compliance "is material to the performance of the contract."

41.     Plaintiff emailed her direct supervisor Mrs. D'Angelo, Mrs. Tomczuk and Joe
Sinni specifically telling them that there were at least three times more out of compliance cases
in Mrs. Tomczuk's department than she had reported.

42.     The cases in Mrs. Tomczuk's department are high value cases – with individual
decisions worth thousands of dollars.

43.     Medicare Advantage (also known as Medicare Part C) plans are offered by private
insurance companies, and allow Medicare recipients to receive services through a private HMO
or MCO, such as HPP, as opposed to directly from Medicare.

44.     Medicare, in turn, pays the companies like HPP offering Medicare Advantage
plans a fixed amount per patient each month. *See* 42 CFR § 422.304.

45.     No changes were made as a result of plaintiff's email.

46.     Also in February 2016, plaintiff emailed Mrs. D'Angelo, Mrs. Tomczuk and Mr. Sinni regarding HPP's failure to follow the Medicaid regulations, namely that members are not being properly informed of changes in their benefits.

47.     Plaintiff became aware of this because Ancillary Services, the department plaintiff managed, was being called by vendors upset that members' benefits were being decreased.

48.     The Medicaid regulations require members be told of changes in their benefits and the services they are entitled to so that they can appeal.

49.     Similarly, nothing was done as a result of plaintiff's report.


**C.  Plaintiff's March 25, 2016 Report of Waste or Wrongdoing to HPP**

50.     Medicare sent HPP notice in late 2015 that it would be conducting an audit of HPP within six months.

51.     Throughout March 2016, plaintiff along with Gretchen Craig, Tiffany Daye, Monica Cartegena, and Corrina Simpson were assigned to review cases as part of an internal audit in preparation for Medicare's coming audit.

52.     During the internal audit, plaintiff and her team discovered hundreds of patient cases in which HPP was not making eligibility determinations for its customers within the time dictated by Medicare regulations.

53.     Namely, the precertification nurses within the Inpatient department did not provide members timely organization determinations nor did they follow the department's policy to approve any request that had not been processed timely.

54.     Members also did not receive notification of HPP to extend the organization determination past the fourteen day timeframe.

55.     Accordingly, thousands of requests for services such as inpatient admissions, cataract surgeries and varicose vein treatments and other elective procedures were denied past the regulatory timeframe.

56.      These cases should have been overturned and approved.

57.     Overturning the cases would cost HPP millions of dollars because HPP is responsible for paying for the services from the per-patient amount it receives from the Commonwealth of Pennsylvania. *See* 42 CFR § 422.304.

58.     Upon information and belief, Paula Tomczuk was aware HPP was not in compliance with the Medicare regulations because the precertification nurses who had failed to comply were in her department.

59.     On March 24, 2016, plaintiff went to Mrs. Tomczuk's office and Colleen Zukowski, a precertification inpatient nurse, was on the speaker phone discussing untimely cases.

60.     Colleen confirmed she and the other nurses were not following the 14 day timeframe to review cases.

61.     She stated that the nurses had Medicare and Medicaid cases in their queues and they sent reminders but had difficulty distinguishing what cases went under which line of business and consequently had not been adhering to the mandatory timeframes.

62.     Colleen kept saying, "No, we're not doing that" to each question Paula asked regarding meeting the regulatory timeframes.

63.     The next day, March 25, 2016, Mrs. D'Angelo came to plaintiff's office and stated there was an emergency meeting about the NOMNC (Notice of Medicare Non-Coverage) issue on the 3rd floor.

64.     When Plaintiff arrived at the meeting Dr. Kumar and Denise Croce were sitting next to each other.

65.     Sitting to the left of Denise Croce was Joe Sinni, Andrea D'Angelo, Andrew Finklestein, VP of Medicare Compliance, Matthew Uebele, Director of Medicare Compliance, plaintiff and Paula Tomczuk.

66.     A consultant from the Gorman group was on speakerphone.

67.     The discussion centered around how to inform Medicare that HPP had not been following the peer to peer regulations and had been out of compliance since 2014, particularly since HPP had failed to make disclosure of noncompliance to Medicare during the disclosure period which had occurred only a few weeks prior.

68.     The consultants stated it was best to inform Medicare right before you conducted the formal on-site interview.

69.     Dr. Kumar stated that basically UM hadn't been following the regulation since 2014 and only found out about its noncompliance through a vendor.

70.     Mrs. D'Angelo stated her belief that it was up to Medicare compliance to inform Medicare, at which point, Andrew Finkelstein, VP of Compliance retorted "Oh, so you're saying this is my fault"?

71.     At that time, Mrs. D'Angelo continued to blame Finkelstein for the nondisclosures until Dr. Kumar and Denise Croce interceded to stop the argument.

72.     At approximately 11 a.m. on March 25, 2016 Mrs. D'Angelo stormed into plaintiff's office with a raised voice asking her how many staff she needed.

73.     The backdrop to the question was that D'Angelo was aware that Plaintiff had been consistently under-staffed and had frequently requested that more staff be assigned to her.

74.      Plaintiff was taken aback by Ms. D'Angelo's manner and asked her what the objective of the meeting was, to which Mrs. D'Angelo screamed, "You don't ask me what the objective is, I ask you what the objective is."

75.     Mrs. D'Angelo again asked plaintiff how much staff she needed.  Plaintiff requested to know what metrics she was using to determine appropriate staff levels and reminded D'Angelo  that she had asked that question in numerous e-mails.

76.     Mrs. D'Angelo responded, *"You need to stop asking questions in e-mails."*

77.     Upon information and belief D'Angelo's statement was a reference to the emails plaintiff had written in February 2016 stating that HPP was violating the Medicare and Medicaid regulations.

78.     Mrs. D'Angelo then told plaintiff that plaintiff should not have her staff write "HIPAA compliant" in files' case notes.

79.     Plaintiff responded that writing "HIPAA compliant" in a file's case notes is not against the Medicare regulations.

80.     Plaintiff then stated that Mrs. Tomczuk's department had hundreds of non-compliant cases that did not adhere with the fourteen day Medicare timeframe and should be administratively overturned and approved as per policy.

81.     Mrs. D'Angelo did not respond but stared at plaintiff for a moment.  She then put a finger in plaintiff's face and told her, "you do what we tell you to do." Mrs. D'Angelo soon thereafter left plaintiff's office.

## D. HPP Terminated Plaintiff In Retaliation For Reporting Waste or Wrongdoing

82.     Throughout March 2016 plaintiff worked seventy and eighty hour weeks to complete her section of the internal audit.

83.     On Friday, March 25, 2016 plaintiff experienced increased pain in the back of her head and was concerned that her headaches were a symptom of elevated blood pressure resulting from  increased anxiety and stress she was experiencing at work.

84.     Plaintiff took a personal day on Monday, March 28, 2016 and went to see Dr. Steven Schmidt in Philadelphia.

85.     Dr. Schmidt examined her and determined that her medical condition required a short work leave and provided Plaintiff with a note requesting medical leave from March 28, 2016 through April 3, 2016, based on stress.

86.     Plaintiff returned to work the following Monday, April 4, 2016.

87.     On April 6, 2016, plaintiff met with Mary Caulder, the Director of Human Resources, Mrs. Tomczuk, and another HR representative.

88.     Mrs. Tomczuk stated plaintiff was being fired for her failure to complete a report concerning notices of Medicare non-coverage for home care services.

89.     Plaintiff explained that she had in fact completed the report and had sent it to Mrs. Tomczuk and Mrs. D'Angelo in an e-mail.

90.     Plaintiff asked Ms. Caulder why this accusation had not been made previously and why she was not being given an opportunity to rebut it.

91.     Ms. Caulder responded that Mrs. D'Angelo had sent Plaintiff an e-mail on April 4, 2016; however, Mrs. D'Angelo's April 4, 2016 acknowledged that Plaintiff had completed the report but falsely claimed that she had sent it in late.

92.     Plaintiff had, in fact, timely completed her entire portion of the Standard Organization Determination ("SOD") report although other HPP departments had failed to complete their sections of the SOD report in a timely manner.

93.     The stated reasons for plaintiff's termination are pretextual.

94.     Plaintiff was terminated in retaliation for reporting HPP's systemic and widespread non-compliance with Medicare and Medicaid regulations.

95.     HPP has an extensive corrective counseling and performance management system, documented on pages 25-26 of its employee handbook, showing five steps in the corrective action process:  Verbal counseling, written warning, corrective action plan, suspension and finally, termination.

96.     Despite stating that "Corrective counseling or discipline will be applied on a progressive basis except in certain situations involving misconduct (e.g. actions that affect Health Partners Plans' reputation, falsifying company records or fighting)," HPP terminated Plaintiff on April 6, 2016, without utilizing any of the four steps it mandates in its corrective action process.

## COUNT I

### Pennsylvania Whistleblower Law

### 43 PA. CONS. STAT. § 1421, *et seq.*

97.    Ms. Burgee incorporates by reference the preceding paragraphs of this complaint as if set forth fully and at length.

98.    Ms. Burgee was retaliated against and terminated in violation of the Pennsylvania Whistleblower Law.

99.    Her reports were reports of "wrongdoing or waste" and were made in good faith to appropriate supervisory personnel and were not of a "merely technical or minimal nature."

## COUNT II

### INTERFERENCE AND RETALIATION IN VIOLATION OF FMLA

100.    Ms. Burgee incorporates by reference the preceding paragraphs of this complaint as if set forth fully and at length.

101.    On February 24, 2015, Plaintiff was approved by Cheree Edney, a human resources employee, for intermittent leave for a serious health condition.

102.    Throughout March 2016 plaintiff worked seventy and eighty hour weeks to complete her section of the SOD report.

103.    On Friday, March 25, 2016 plaintiff experienced increased pain in the back of her head and was concerned that this was a symptom of elevated blood pressure resulting from the increased anxiety and stress she was experiencing at work.

104.    Plaintiff received an email from Mr. Sinni on Sunday, March 27 asking her to review part of the SOD file that was not her responsibility.  She responded by email that she would try to but had an excruciating headache.

105.    Plaintiff took a personal day on Monday, March 28, 2016 and went to see Dr. Steven Schmidt in Philadelphia.

106.    Plaintiff telephoned Mrs. Tomczuk and reported that she was taking the day off to see the doctor.

107.    Dr. Schmidt then wrote her a note excusing her from work for that week, from March 28, 2016 through April 3, 2016, to permit her to recover from work related stress.

108.    HPP had notice that plaintiff was under doctor's care for a "serious health condition" within the meaning of the Family Medical Leave Act.

109.    On Tuesday, March 29th Plaintiff requested that she be provided with FMLA leave forms. Defendant's Human Resources agent, Ms. Edney assured Plaintiff that she would mail plaintiff the required FMLA paperwork and advised plaintiff to bring the note from her doctor when she returned to work the following week.

110.    Plaintiff gave the note from her doctor to receptionist Katrina Patterson when she returned to work the following Monday, April 4, 2016.

111.    Plaintiff then sent Ms. Edney an email stating, "Can I come around to talk about the FMLA?"

112.    Ms. Edney called her back and told her that she had mailed the FMLA paperwork to her house and to let her know if she didn't get it by Thursday.

113.    Plaintiff was terminated on Wednesday, April 6, 2016 and never received the FMLA paperwork.

114.    In terminating plaintiff, defendant retaliated against her for having taken leave protected by the FMLA, interfered with rights secured to plaintiff by the FMLA and otherwise violated her rights under the FMLA.

15

## COUNT III

## 42 U.S.C. § 1981 – FAILURE TO PROMOTE

115.     Ms. Burgee incorporates by reference the preceding paragraphs of this complaint as if set forth fully and at length.

116.     Plaintiff is a highly skilled administrator, manager and nurse having worked in various capacities in healthcare for two decades.

117.     Immediately before she returned to HPP in 2011, plaintiff worked for more than three years as a supervisor for Keystone Mercy Health Plan in its Prior Authorization Department where she was responsible for ensuring that the department was compliant with Department of Health regulatory (DOH) regulatory requirements and The National Committee for Quality Assurance (NCQA) standards as well as internal policies and procedures.

118.     Upon information and belief, HPP had an opening for the position of Director of Utilization Management in approximately June 2013.

119.     Plaintiff was qualified for this position as she had previously held this position while at Bravo in 2007.  Plaintiff had worked for more than twenty years in UM first as a case manager and later supervising a staff of over fifty people.

120.     Andrea D'Angelo, the Vice President of UM, had specifically recruited plaintiff to return to HPP by promising Plaintiff that she was creating a director of UM position and felt that Plaintiff would be promoted to that position.

121.     In the Spring of 2012 Plaintiff submitted her application for the position of Director of Utilization Management and interviewed with Mrs. D'Angelo and Carol Smolij, the Vice President of Case Management.

122.     Plaintiff first interviewed with Mrs. D'Angelo, and was assured that the interview had gone well.

16

123.   Plaintiff's interview with Ms. Smolij however did not go well as *she did not ask plaintiff any questions*, but instead lectured for approximately a half hour telling Plaintiff that high-level management at HPP do not get along and that "the individual who takes this role will be the face of the department."

124.   Upon information and belief Ms. D'Angelo, with input from Ms. Smolij made the decision to not hire plaintiff for the position of Director of UM.

125.   Joe Sinni, a Caucasian male, was awarded the position instead.

126.   Mr. Sinni had no experience in UM and had no regulatory knowledge of applicable   Medicare or Medicaid regulations, knowledge of which is a crucial qualification for the position.

127.   Defendant did not promote plaintiff to the position of Director of Utilization based on her race.

128.   HPP had an opening for the Director of Medicare Operational Compliance in the summer of 2014.

129.   Plaintiff was qualified for the position based on her experience in managing large teams and her experience working with the Center for Medicare & Medicaid Services ("CMS"), which demonstrated that she was adept at hiring, promoting and retaining staff. In addition, Plaintiff's good performance evaluations, experience with the Medicare regulations, and commendation from Sonia Madison, the prior president of HPP should have positioned her as a prime candidate for the position.

130.   Plaintiff applied for the position but did not receive an interview.

131.   Matthew Uebele, a Caucasian male was hired as the Director of Medicare Operational Compliance.

17

132.    Defendant did not promote or permit plaintiff to interview for the position of Director of Medicare Operational Compliance based on her race.

133.    HPP had an opening for the Director of Medicare Healthcare Management in approximately October 2014.

134.    Plaintiff was qualified for the position as she had experience with Medicare, Medicare regulations and Medicare audits at HPP as well as an outstanding record of performance.

135.    Plaintiff submitted her application.

136.    Again, Carol Smolij was the decision-maker and plaintiff interviewed with Ms. Smolij; they met at Maggianos restaurant, talked about plaintiff's experience and qualifications, after which Ms. Smolij admitted that Plaintiff was an excellent candidate and promised that they would meet again for a second interview.

137.    Ms. Smolij scheduled four additional meetings with plaintiff and cancelled each time.  Each time she told plaintiff to put something on her calendar and each time she then cancelled the scheduled meeting.

138.    Jamie Mattozza was awarded the position of Director of Medicare Healthcare Management.  She is Caucasian and was unfamiliar with the Medicare regulations.

139.    Indeed, Plaintiff personally witnessed Ms. Mattozza asking other employees for help and advice concerning Medicare regulations on many occasions.

140.    Defendant did not promote plaintiff to the position of Director of Medicare Healthcare Management based on her race.

141.    HPP again had an opening for the position of Director of Utilization Management in approximately June 2015.

142.    Plaintiff was qualified but did not apply because she was aware that Paula Tomczuk, Caucasian, was being groomed to get the position despite having less experience than Plaintiff with Medicare and Medicaid regulations.

143.    Mrs. Tomczuk was hired for the Director of Utilization Management position.

144.    Defendant did not promote plaintiff to the position of Director of Utilization Management based on her race.

145.    HPP had an opening for the position of Director of Dual Eligible Special Needs in September 2015.

146.    Plaintiff was qualified for the position though but did not apply because Carol Smolij was the decision-maker.

147.    Nancy (LNU), who is Caucasian, was hired for the position despite having no experience working with Medicare regulations, a necessary qualification for the position.

148.    Defendant did not promote plaintiff to the position of Director of Dual Eligible Special Needs plans based on her race.

149.    Jamilla Perry heard Mrs. D'Angelo, the VP of UM, say that she had never been around so many educated African-Americans. Ms. Perry reported that comment to Plaintiff at or about the time it was made.

150.    Plaintiff also overheard Paula Tomczuk, state that she had an African-American male at her house and her mother-in-law said she was surprised the man had not robbed them. Mrs. Tomczuk told this story at a work lunch at Maggianos with plaintiff and Caucasian co-workers BJ Caldwell, and Mr. Sinni, plaintiff's supervisor at the time. Mrs. Tomczuk thought the story was funny.

151.    Plaintiff was not hired by HPP for any of the available Director positions despite her excellent record and qualifications because of her race.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment against defendant and requests the following relief:

        a.      Declaring the acts complained of herein to be in violation of the Pennsylvania Whistleblower Law;

        b.      Declaring the acts complained of herein to be in violation of 42 U.S.C. § 1981;

        c.      Declaring the acts complained of herein to be in violation of the FMLA;

        d.      Entering judgment against the defendant and in favor of the Plaintiff in an amount to be determined;

        e.      Order that defendant reinstate Plaintiff to her position with defendant or to a comparable position in terms of salary, benefits and responsibilities;

        f.      Order that defendant make Plaintiff whole for all the losses she has suffered, still suffers, and will suffer in terms of wages, benefits, insurance and pension coverage, and any other fringe benefits of her employment;

        g.      Awarding compensatory damages to make Plaintiff whole for all lost earnings, earning capacity and benefits, past and future, which Plaintiff has suffered or may suffer as a result of defendant's improper conduct;

       h.     Awarding compensatory damages to Plaintiff for past and present pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasures, which Plaintiff has suffered and continues to suffer as a result of defendant's improper conduct;

       i.     Awarding Plaintiff pre-judgment and post-judgment interest;

       j.     Awarding Plaintiff reasonable attorneys' fees, paralegal fees, expert fees and all costs, expenses and disbursements associated with pursuing this action;

       k.     Awarding liquidated damages pursuant to Plaintiff 's claim under the FMLA;

       l.     Awarding punitive damages on the grounds of upper management's actual participation in and/or willful indifference to defendant's discrimination against Plaintiff under 42 U.S.C. § 1981;

       m.     Awarding Plaintiff such other damages as are appropriate under the Pennsylvania Whistleblower Law, the FMLA, and 42 U.S.C. § 1981; and

       n.     Granting Plaintiff such other relief as the Court deems just, proper, and/or equitable.

**GREENBLATT PIERCE ENGLE
FUNT & FLORES, LLC**

Dated:   9/29/16

Patricia V. Pierce
Lori Mach
Ronald L. Greenblatt
Greenblatt Pierce Engle Funt & Flores, LLC
*Attorneys for Michelle Burgee*